1

2

3                                                        O

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11  PAYAM AHDOOT, etc.,        )   Case Nos.
                               )   **CV 13-02823-VAP (VBKx)**
12              Plaintiffs,    )   CV 13-07898-VAP (VBKx)
                               )
13       v.                    )   **ORDER GRANTING MOTION FOR**
                               )   **FINAL APPROVAL OF CLASS**
14  BABOLAT VS NORTH           )   **ACTION SETTLEMENT (DOC. NO.**
    AMERICA, INC., etc.,       )   **62) AND GRANTING MOTION FOR**
15              Defendants,    )   **ATTORNEY FEES, COSTS,**
                               )   **INCENTIVE AWARDS, AND**
16                             )   **ADMINISTRATION COSTS (DOC.**
    BRANDON CLARK, etc.,       )   **NO. 63)**
17              Plaintiffs,    )
                               )   **[Motions filed on February**
18       v.                    )   **27, 2015 ]**
                               )
19  BABOLAT VS NORTH           )
    AMERICA, INC., etc.        )
20              Defendants.    )
    _____ )
21

22

23       On February 27, 2015, Plaintiffs Payam Ahdoot

24  ("Ahdoot") and Brandon Clark ("Clark") (collectively,

25  "Plaintiffs") filed a "Motion for Final Approval of Class

26  Action Settlement" ("Approval Mot.") and a "Motion for

27  Attorney Fees, Costs, Incentive Awards, and Settlement

28  Administration Expenses" ("Fee Mot.").  (Doc. Nos. 62-

63.)  Plaintiffs seek final judicial approval of an agreement to settle claims that Defendant Babolat VS North America, Inc. ("Babolat"), used deceptive advertising to sell tennis racquets; Babolat has filed a Notice of Non-Opposition to Plaintiffs' motions.  (See Doc. No. 67.)  The motions came before the Court for hearing on April 6, 2015.  After consideration of the papers filed in support of the motions, the Court GRANTS the motions, and enters final approval of the settlement between Plaintiffs and Babolat, and approves Class Counsel's request for attorneys' fees and other associated litigation costs.

## I. BACKGROUND[1]

### A.  Plaintiffs' Allegations and Preliminary Approval of the Settlement

Ahdoot filed his action on April 22, 2013.[2]  (Doc. No. 1.)  Ahdoot's action was consolidated with Clark's action on December 19, 2013.  (Doc. No. 32.)  Plaintiffs brought this putative class action against Babolat, alleging it had engaged in false and misleading advertising with respect to its AeroPro Drive tennis

---

[1]  On December 2, 2014, this case was randomly reassigned to the docket of the undersigned from the docket of the judge initially assigned to this case, Judge Gary A. Feess, pursuant to Order of the Chief Judge 14-083.  (Doc. No. 60.)

[2]  Ahdoot filed a similar action on January 11, 2013, but dismissed it before Babolat answered the complaint.  (Approval Mot. at 3.)

1  racquets ("AeroPro"), endorsed by Rafael Nadal ("Nadal"),
2  its Pure Drive tennis racquets ("Pure Drive"), endorsed
3  by Andy Roddick ("Roddick"), and a number of other
4  racquets associated with professional tennis players.
5  (Second Amended Complaint (Doc. No. 55) ¶¶ 4-11.)
6
7      Plaintiffs allege that Babolat misrepresented to
8  consumers that the racquets available for purchase by the
9  public were identical to those used on the professional
10 tennis tour by professional players when, in reality,
11 "[t]he racquets which many of the Babolat-sponsored pros
12 actually use are much different than [those racquets] and
13 [are] not available to the public."  (Id. ¶ 4.)
14 Moreover, Plaintiffs aver that Babolat's use of the
15 phrase "Nadal's racquet of choice" is misleading and that
16 "[p]rior to major professional tennis tournaments,
17 Babolat paints and otherwise modifies these pros'
18 customized racquets so that they appear to be identical
19 to the ones sold in stores and on the internet."  (Id.)
20 The SAC also describes what Plaintiffs characterize as a
21 "long-term and pervasive advertising campaign [by
22 Babolat] . . . designed to deceive consumers about the
23 racquets it sells."  (Id. ¶ 5.)
24
25     Specifically, on or about January 15, 2011, Plaintiff
26 Ahdoot, believing he was purchasing the same AeroPro
27 racquet used by Nadal, purchased an AeroPro Drive racquet
28

for a total of $222.92 from Westwood Sporting Goods in
Los Angeles, California.  (<u>Id.</u> ¶ 30.)  In April 2012,
Plaintiff Clark, believing he was purchasing the same
Pure Drive racquet used by Roddick, purchased two Pure
Drive Roddick racquets for a total between $250 and $300.
(<u>Id.</u>)  Plaintiff Clark, believing he was then purchasing
the same AeroPro racquet used by Nadal, purchased two
AeroPro racquets directly from Babolat in May 2010 for
$254.  (<u>Id.</u>)

        Plaintiffs allege that they have therefore "suffered
injury in fact and lost money by purchasing racquets they
otherwise would not have purchased" but for Babolat's
deceptive advertising.  (<u>Id.</u> ¶ 42.)  On this basis,
Plaintiffs assert claims against Babolat for: (1)
violation of California's Unfair Competition Law ("UCL"),
Cal. Bus. & Prof. Code § 17200; (2) violation of the
Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code
§ 17500; (3) breach of express warranty; (4) violation of
False Advertising Law ("FAL"), Cal Bus. & Prof. Code
§§ 17500 et seq.; (5) fraud; and (6) negligent
misrepresentation.  (<u>See</u> SAC.)

        The parties reached an agreement on the terms of a
settlement of the class claims after discovery -- which
included an exchange of more than 30,000 documents and
multiple depositions of Babolat's employees -- and arm's

length negotiations with the assistance of a mediator. (See Approval Mot. at 3-6.)  As a result, the partes entered into a Stipulation and Agreement of Settlement. (See Declaration of Christopher J. Hamner in Support of Approval Mot. ("Hamner Decl.") (Doc. No. 62-2) at Ex. 1 ("Settlement Agmt.") (Doc. No. 62-3).)

In the motion for preliminary approval of class settlement, the Plaintiffs sought and received the following: (1) preliminary approval of the proposed class settlement; (2) approval of the form and content of the Short Form and Long Form Publication Notices, substantially in their proposed forms; (3) certification of the Class for settlement purposes; (4) the appointment of Payam Ahdoot and Brandon Clark as Class Representatives for the Class; (5) the appointment of Hamner Law Offices, APC; the Olsen Law Offices, and Wootton Law Group, LLP as Class Counsel for settlement purposes; (6) leave for Plaintiffs to amend their complaint; (7) enjoinment of Settlement Class Members from commencing or continuing any action asserting any claims encompassed by the Settlement Agreement unless the Class Member submits a valid Request for Exclusions, with the exception of Plaintiffs filing the Second Amended Complaint, proceedings related to final approval of the Settlement and consideration of Class Counsel's Fee and Cost Application; (8) preliminary approval of

1  administration costs to be paid to the Settlement
2  Administrator; (9) an immediate stay of the Action, with
3  the exception of proceedings relating to the Settlement
4  Agreement; and (10) the scheduling of a final approval
5  hearing.  (Order Granting Preliminary Approval of Class
6  Action Settlement ("Approval Order") (Doc. No. 54) at 2.)
7  Judge Feess approved preliminarily the terms of the
8  Settlement Agreement on October 7, 2014.  The Approval
9  Order was modified twice to correct minor typographical
10  errors and omissions.  (See Doc. Nos. 56, 59.)

11

12  **B.    The Settlement Agreement**

13       The Settlement Agreement is the result of "extensive
14  discovery, including the production and review of tens of
15  thousands of pages of documents, many of which were in
16  French and required translation into English . . . taking
17  depositions of the parties, . . . [and] a day long
18  mediation in San Francisco with mediator Antonio Piazza."
19  (Approval Mot. at 6; Approval Order at 3.)  Class Counsel
20  "is convinced that the proposed Settlement is in the best
21  interests of the Class based on the negotiations and a
22  detailed knowledge of the issues present in this Action."
23  (Approval Mot. at 9; Approval Order at 3.)  "The length
24  and risks of trial and other normal perils of litigation
25  that may have impacted the value of the claims were all
26  weighed in reaching the proposed Settlement."  (Id.)  "In
27  addition, the uncertainty of class certification, the
28

difficulties of complex litigation, the lengthy process of establishing specific damages and various possible delays and appeals were also carefully considered by Class Counsel in agreeing to the proposed Settlement." (Id.)

### 1. The Settlement Class

The Proposed Settlement encompasses a Settlement Class defined as

> all Persons who engaged in a Qualifying Transaction with the exception of employees, principals, officers, directors, agents, affiliated entities, legal representatives, successors, or assignees of Babolat VS North America, Inc.; distributors, dealers, and retailers of Babolat VS North America, Inc. or its parent, Babolat VS SA, to the extent the Qualifying Racquets were purchased by the distributors, dealers, and retailers for resale and not for personal use; and the District Court and any other judges who may be assigned to the Action and any members of their immediate families.

(Settlement Agmt. at 9, § EE.)  A Qualifying Transaction is the "purchase of a Qualifying Racquet(s) for personal use, and not for resale during the Class Period."  (Id. at 8, § X.)  A Qualifying Racquet includes the following Babolat tennis racquets:

> Pure Drive, Pure Drive +, Pure Drive 107, Pure Drive Roddick, Pure Drive + Roddick, Pure Drive Roddick Junior, Pure Drive Lite, Pure Drive French Open, Pure Drive Lite French Open, Pure Drive 260 French Open, Pure Drive Junior 26 French Open, Pure Drive Lite Pink, Pure Drive Wimbledon, Pure Drive Junior Wimbledon, Pure Drive Play, AeroPro Drive, AeroPro Drive +, AeroPro Drive Junior, AeroPro Team, AeroPro

1      Lite, AeroPro Drive French Open, AeroPro Drive
Junior French Open, AeroPro Lite French Open,
2      AeroPro Team Wimbledon, Aero Storm, Aero Storm
Tour, Pure Storm, Pure Storm Limited, Pure Storm
3      Limited +, Pure Storm Tour, Pure Storm Tour +,
Pure Storm Team, Pure Control, Pure Control
4      Tour, Pure Control Tour +, Pure Control 95 and
Pure Control 95 +.

6  (<u>Id.</u> at 7-8, § W.)

8     The Class Period is defined as "the period beginning

9  on January 1, 2009, and ending on November 11, 2014, or,

10  if later, the actual date of publication of the

11  November/December issue of Tennis Magazine containing the

12  Short Form Publication Notice."  (<u>Id.</u> at 5, § G.)

14     **2.   The Terms of the Settlement**

15     Each Settlement Class Member who submits a Valid

16  Claim with a proof of purchase "will be entitled to a

17  reimbursement of fifty U.S. dollars ($50) for each adult

18  racquet and twenty five U.S. dollars ($25) for each

19  junior racquet for each Qualifying Transaction."

20  (Settlement Agmt. at 13, ¶ 2.)  Each Settlement Class

21  Member who does not have a proof of purchase but who can

22  provide the Qualifying Racquet's serial number will "be

23  entitled to a reimbursement of fifty U.S. dollars ($50)

24  for each adult racquet for each Qualifying Transaction .

25  . . up to a maximum of ten (10) Qualifying Racquets per

26  Person."  (<u>Id.</u> at 13-14, ¶ 2.)  All junior racquets and

27  some adult racquets do not have serial numbers and thus

1  do not qualify for such reimbursement.   (Id. at 14,

2  ¶ 2.)  For junior racquets and adult racquets without a

3  serial number or proof of purchase, each "Settlement

4  Class Member who submits a Valid Claim will be entitled

5  to a reimbursement of twenty U.S. dollars ($20) for each

6  adult racquet and ten U.S. dollars ($10) for each junior

7  racquet obtained through a Qualifying Transaction up to a

8  maximum of three (3) Qualifying Racquets per Person."

9  (Id. at 14, ¶ 2.)

10

11      The Settlement Agreement provides that Babolat will

12  establish a non-reversionary fund of $4,500,000[3]

13  including the following payments, subject to Court

14  approval: (1) attorneys' fees of $1,125,000, which is 25%

15  of the Gross Settlement Fund ("GSF"); (2) costs of up to

16  $150,000.00, of which Plaintiffs' counsel is requesting

17  $78,134.65; (3) incentive awards in the amount of $5,000

18  to each named Plaintiff in consideration for serving as

19  Class Representative; and (4) estimated Settlement

20

21  _____

22  [3]     The parties also agreed that the Gross Fund
    Value will be funded in installments: (1) the first
    installment of $300,000; (2) additional deposits of
23  $200,000 per month for the following six months; and (3)
    in the eight months from the approval and entry of the
24  Preliminary Approval Order, additional deposits as
    necessary "to bring the total of deposits and accrued
25  interest to four million five hundred thousand U.S.
    dollars ($4,500,000)." (Settlement Agmt. at 11-12;
26  Approval Order at 5.)  These payments will be made to "an
    escrow account with a reputable financial institution"
27  who will administer those funds "as approved by the
    Parties and the Settlement Administrator." (Settlement
28  Agmt. at 11; Approval Order at 5.)

Administration expenses of up to $133,000-$240,000, of
which Plaintiffs' counsel is requesting $194,524.78.
(Approval Order at 3; Approval Mot. at 6-7.)  After all
Court-approved deductions, the Net Settlement Fund[4] is
estimated to be $3,092,340.57.  (Approval Mot. at 7.)  If
the aggregate of all Valid Claims exceeds the Net
Settlement Fund, each reimbursement "will be adjusted
downward on a Qualifying Racquet *pro rata* basis."
(Settlement Agmt. at 14, ¶ 3.)  Should the Net Settlement
Fund exceed the amount of Valid Claims submitted,
remaining funds "shall be distributed *cy pres* as follows:
(a) fifty percent (50%) to St. Jude's Children's Research
Hospital . . . and (b) fifty percent (50%) to USTA
Serves."  (Id. at 14, ¶ 4.)  The parties have also agreed
to non-monetary benefits, including: (1) Babolat's
implementation of disclaimers in connection with
professional endorsements; (2) Babolat ceasing to
reference in any US advertisements that any of its
racquets contain tungsten; (3) Babolat ceasing to refer
to tungsten in "their advertising, marketing,
communications and labeling in the United States in
connection with 'GT Technology.'"  (Approval Mot. at 8-9;
Approval Order at 3.)

---

[4]   After deducting the payment of attorneys' fees,
costs, Class Representative incentive awards, and
Settlement Administration expenses, the remaining Net
Settlement Fund shall be available to pay Valid Claims
submitted by Class Members.  (Settlement Agmt. at 6-7, §
Q; Approval Order at 5.)

1    In exchange for the Settlement benefits, Settlement
2  Class members are deemed to have "fully, finally, and
3  forever released, relinquished and discharged each and
4  all of the Babolat Releasees from any and all of the
5  Class Representatives' and each and every Settlement
6  Class Member's . . . respective claims, actions, demands,
7  suits, and causes of action, whether class, individual or
8  otherwise in nature. . . ." (Settlement Agmt. at 23, §
9  B; Approval Order at 6-7.) This release includes

    costs, expenses, penalties and attorneys' fees,
    known or unknown, suspected or unsuspected,
    direct or indirect, contingent or absolute,
    existing or potential, in contract or in tort,
    in law or equity, that the Class Representatives
    and each and every Settlement Class Member . . .
    ever had, now has, or hereafter can, will, or
    may have, arising out of (i) advertising,
    marketing and conduct of whatever kind by the
    Babolat Releasees related to any and all
    professional athletes and their connection with,
    affiliation with, association with or
    endorsement of the Qualifying Racquets and any
    components thereof; (ii) the use of the term "GT
    Technology" and "tungsten" in the Babolat
    Releasees' advertising, marketing materials,
    labeling, and any other communication or
    information of whatever kind related to the
    Qualifying Racquets, (iii) factual allegations
    or claims made in the Second Amended Complaint,
    and (iv) any violation or alleged violation of
    any federal or state law and any federal or
    state statute, including but not limited to
    California Business & Professions Code §§ 17200,
    et seq., 17500 et seq., and California Civil
    Code §1750, predicated on (i), (ii) or (iii)
    (the "Released Claims").

(Settlement Agmt. at 24.)

11

### 3.   The Settlement Administration and Notice

After preliminary approval, the settlement administrator was required to: (1) "provide copies of the Settlement Account's monthly statements to Class Counsel and Babolat's Counsel no later than the fifteenth (15th) day of each month" until the Final Effective Date of the Settlement; (2) examine and verify submitted claims; (3) administer the publication of the Short Form Publication Notice in Tennis Magazine; (4) administer the placement of the banner advertisement regarding the Settlement on Tennis.com; (5) administer the creation, operation, maintenance, and cessation of the Settlement website Babolatsettlement.com; (6) "prepare a declaration affirming compliance with the notice requirements," and provide such declaration "to Babolat's Counsel and Class Counsel no later than fourteen (14) days prior to the Final Approval Hearing;" (7) "prepare and deliver to Babolat's Counsel and Class Counsel a report stating the total number of Persons who submitted valid Requests for Exclusion from the Settlement Class and the names and contact information of such Persons as well as the quantity and type of the Qualifying Racquets each Person purchased;" (8) "provide periodic updates to Class Counsel and Babolat's Counsel regarding Claim Form submissions" no later than one week after the Claims Period begins and at least once monthly thereafter; and (9) provide to Babolat or other Person as Babolat may

direct an electronically searchable alphabetical list of the Settlement Class Members who were paid out of the Net Settlement Fund, their contact information, and the amount paid to them. (Settlement Agmt. at 12, 14, 16-17.) The Settlement website was required to be operational on or before the first day on the Short Form Publication Notice appears in Tennis Magazine. (Id. at 15.)

Members of the Settlement Class may opt out of the settlement by submitting a written request postmarked no later than twenty-one days before the Final Approval Hearing to the Settlement Administrator to be excluded from the class. (Id. at 8, § Z.) This letter must contain: (1) the Class Member's name, current mailing address, and telephone number; (2) the racquet(s) the Class Member purchased, the approximate dates of such purchase(s), and location of such purchase(s); (3) the statement "I want to be excluded from the proposed Class Action Settlement in the Babolat lawsuit;" and (4) the Class Member's signature. (Approval Order at 6.)

The Short Form Publication Notice, Long Form Publication Notice, and banner advertisement containing a link to the Settlement website, Babolatsettlement.com, on the United States version of websites Babolat.com and Tennis.com proposed by the Parties will provide Settlement Class members with appropriate information

about: (1) the nature of the action; (2) the class definition; (3) a description of the claims at issue; (4) a summary of the proposed settlement terms; (5) a description of the settlement formula and distribution including Plaintiff's enhancement award and Class Counsel's attorney's fee award and costs, the terms of the release; and (6) the right of Settlement Class members to be excluded from the class or to object to the Settlement Agreement and the procedures for doing so. (Id.) The Settlement website, Babolatsettlement.com shall contain: (1) the Short Form Publication notice; (2) the Long Form Publication Notice; (3) the Claim Form; (4) the Settlement Agreement, without exhibits; (5) the Second Amended Complaint; and (6) the Preliminary Approval Order. (Settlement Agmt. at 16, § A.)  The Long Form Publication Notice and the Settlement website also include contact information for the Settlement Administrator and Class Counsel.  (Approval order at 6; Settlement Agmt. at 16, § A.)

## II. LEGAL STANDARD

Under Rule 23(e) of the Federal Rules of Civil Procedure, "claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval."  Fed. R. Civ. P. 23(e).  A court must engage in a two-step process to approve a proposed class action settlement. First, the

court must determine whether the proposed settlement deserves preliminary approval. Nat'l Rural Telecomms. Coop. v. DirecTV, Inc., 221 F.R.D. 523, 525 (C.D. Cal. 2004). Second, after notice is given to class members, the Court must determine whether final approval is warranted. Id. A court should approve a settlement pursuant to Rule 23(e) only if the settlement "is fundamentally fair, adequate and reasonable." Torrisi v. Tucson Elec. Power Co., 8 F.3d 1370, 1375 (9th Cir. 1993) (internal quotation marks omitted); accord In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 458 (9th Cir. 2000) (citing Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998)).

Circuit law teaches that the court must balance the following factors to determine whether a class action settlement is fair, adequate, and reasonable:

(1) the strength of the plaintiff's case;
(2) the risk, expense, complexity, and likely duration of further litigation;
(3) the risk of maintaining class action status throughout the trial;
(4) the amount offered in settlement;
(5) the extent of discovery completed and the stage of the proceedings;
(6) the experience and views of counsel;

15

(7) the presence of a governmental participant; and

(8) the reaction of the class members to the proposed settlement.

Torrisi, 8 F.3d at 1375; accord Linney v. Cellular Alaska Partnership, 151 F.3d 1234, 1242 (9th Cir. 1998); Hanlon, 150 F.3d at 1026. "In addition, the settlement may not be the product of collusion among the negotiating parties." In re Mego Fin. Corp. Sec. Litig., 213 F.3d at 458. These factors are not exclusive, and one factor may deserve more weight than the others depending on the circumstances. Torrisi, 8 F.3d at 1376. In some instances, "one factor alone may prove determinative in finding sufficient grounds for court approval." Nat'l Rural Telecomms. Coop., 221 F.R.D. at 525-26 (citing Torrisi, 8 F.3d at 1376). In addition, "[t]he involvement of experienced class action counsel and the fact that the settlement agreement was reached in arm's length negotiations, after relevant discovery had taken place create a presumption that the agreement is fair." Linney v. Cellular Alaska Partnership, 1997 WL 450064, *5 (N.D. Cal. July 18, 1997), aff'd, 151 F.3d at 1234.

### III. DISCUSSION

**A.   Final Approval of the Settlement**

    **1.   Approval of the Settlement Terms**

    As discussed below, the <u>Torrisi</u> factors favor final approval of the settlement.

        **a.   Strength of Plaintiffs' Case**

    According to Plaintiffs' counsel, "Plaintiffs strongly believe that the Class claims are legally meritorious and present more than a reasonable probability of a favorable determination on behalf of the Class." (Approval Mot. at 14.)  Each member of the class will receive a 25%-34% refund of the purchase price paid for each racquet, provided they can provide a proof of purchase.  (<u>Id.</u> at 1-2.)  Should a class member not have a proof of purchase, he or she can still receive a refund.  (<u>Id.</u> at 2.)  As a result of the settlement, Babolat has changed its advertising and business practices.  All of this suggests that Plaintiffs' case had merit.  Thus, this factor weighs in favor of approval.

       **b.   The Risk, Expense, Complexity, and Likely Duration of Further Litigation**

    Plaintiffs' counsel notes that there are always inherent risks associated with prosecuting a matter through trial, and this case is no exception.  (Approval

Mot. at 15.)  "While Babolat has agreed to settle the action, if this case were to proceed, Babolat would undoubtedly continue to assert a vigorous defense on liability." (<u>Id.</u> at 16.)  In addition, even if Plaintiffs were able to succeed at trial, the burden of proving damages would remain; there is no guarantee that members of the Class would receive more than the Settlement Agreement provides if this case went to trial. (<u>Id.</u>)  As further litigation would undoubtedly be expensive and complex, and because there are significant risks to members of the class regarding their ability to succeed on the merits or to prove damages, this factor weighs in favor of approval.  (<u>Id.</u> at 16-17.)

### c.   The Risk of Maintaining Class Action Status Throughout the Trial

The Court may revisit the certification of the class at any time before entry of final judgment.  <u>See</u> Fed. R. Civ. P. 23(c)(1)(C).  Where there is a risk that class certification might not be maintained before entry of final judgment, this factor favors approving the proposed settlement.

Class Counsel contends that class certification is difficult to obtain in false advertising cases.  (<u>Id.</u> at 14-15.)  Recently, a judge of this district denied a motion for class certification in a factually similar

case concerning a professional tennis player's use of a
similar racquet for sale to the public. (<u>See</u> <u>id.</u> at 15
(citing <u>Kramer v. Wilson</u>, case no. 2:13-cv-06330-JFW-
SH).) Class certification was denied in that case
because the court found the plaintiff failed to meet his
burden of demonstrating that questions of fact and law
common to all class members predominated over questions
affecting only individual class members. (<u>Id.</u>) Though
counsel maintain that the instant case is factually
distinguishable, there nevertheless is the risk that
continued class certification presents a risk to
Plaintiffs. (<u>Id.</u>)

Moreover, Babolat only assented to the Settlement
Agreement with the assumption that it would be approved;
should the Court not approve the settlement, Babolat has
the right to terminate the agreement. (Settlement Agmt.
at 20, § D.) In addition, should the Court not approve
the settlement, the "Settlement Agreement [cannot] be
offered, or received into evidence in any matter" other
than for purposes of approval. (<u>Id.</u> at 27-28, § IX.)

Given the uncertainty regarding Plaintiffs' ability
to maintain class certification throughout the case, this
factor also favors approving the proposed settlement.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### d.    The Amount Offered in Settlement

As noted above, the Settlement Agreement requires Babolat to create a settlement fund of $4.5 million.  The agreement was "negotiated after extensive discovery and an all day mediation" and it "resulted in substantial monetary benefits and significant changes to Babolat's advertising."  (Approval Mot. at 19.)  "The Class Recovery is significant in that it contemplates reimbursement in the range of 25%-34% of the purchase price with respect to the racquets at issue.  The settlement not only falls within the range of possible judicial approval, but represents an excellent recovery on behalf of the Class."  (Hamner Decl. at ¶ 7.) Given the risks and uncertainty attendant to this litigation as previously discussed, the Court finds that the amount of recovery each class member may recover weighs in favor of the Settlement Agreement's overall reasonableness.

### e.    The Extent of Discovery Completed and
### the Stage of the Proceedings

Throughout the course of litigation, "[v]oluminous written discovery has been propounded, reviewed and responded to by the Parties.  Babolat produced, and Plaintiffs' Counsel reviewed over 30,000 pages of documents, many of which were in French and required translation into English."  (Approval Mot. at 4, 18.)

1    Moreover, numerous Babolat representatives were deposed
2    and product inspections were conducted.  (Id. at 4, 18.)
3    The record is clear that significant discovery was
4    undertaken by both parties.  As Class Counsel had
5    "sufficient information to make an informed decision
6    about settlement," this factor weighs in favor of
7    approval.  See Linney, 151 F.3d at 1239.
8
9              f.    The Experience and Views of Counsel
10        As noted above, Class Counsel contends that the
11   Settlement Agreement "not only falls within the range of
12   possible judicial approval, but represents an excellent
13   recovery on behalf of the class."  (Hamner Decl. at ¶ 7.)
14   Class Counsel have significant experience litigating
15   class action cases.  (Id. at ¶¶ 18-19.)  Counsel's
16   experience litigating class action cases, along with
17   their view that the Settlement Agreement presents a
18   significant recovery for the Plaintiffs', persuades the
19   Court that the Settlement Agreement is fair, reasonable,
20   and adequate in this case.  This weighs in favor of
21   approval.
22
23             g.    The Reaction of the Class Members to the
24                   Proposed Settlement
25        According to Class Counsel, "[a]s of February 24,
26   2014, 17,203 Class Members filed valid claim forms, and
27   not a single Class Member objected to the settlement or
28

21

1  requested to be excluded." (Approval Mot. at 21 (bolding
2  omitted).)  The lack of any objection whatsoever by Class
3  Members to the Settlement Agreement weighs in favor of
4  approval.
5
6           h.   Whether the Settlement Was a Product of Non-
7                Collusive Bargaining
8       Finally, as noted above, the Settlement Agreement was
9  reached with the assistance of a mediator. (Approval
10  Mot. at 5.)  Settlements reached with the help of a
11  mediator are likely non-collusive. Satchell v. Fed.
12  Express Corp., 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13,
13  2007) ("The assistance of an experienced mediator in the
14  settlement process confirms that the settlement is non-
15  collusive.").  The parties have presented no reason to
16  find that the Settlement Agreement was anything other
17  than the product of arm's-length negotiations.
18  Accordingly, the Court finds this factor weighs in favor
19  of approval.
20
21       As all of the above factors weigh in favor of final
22  approval, the Court finds the Settlement Agreement to be
23  fair, reasonable, and adequate.
24
25       2.   Approval of the Notice Procedures
26       Rule 23 requires the court to direct to Class Members
27  "the best notice that is practicable under the
28

circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). In addition, Rule 23(e)(1) requires the court to "direct notice in a reasonable manner to all class members who would be bound by the proposal." The notice must explain in easily understood language the nature of the action, definition of the class, class claims, issues and defenses, ability to appear through individual counsel, procedure to request exclusion, and binding nature of a class judgment. Fed. R. Civ. P. 23(c)(2)(B). Plaintiff must provide notice to potential opt-in class members that is "timely, accurate, and informative." See Hoffmann-La Rouche Inc. v. Sperling, 493 U.S. 165, 172 (1989). Likewise, claim forms must be informative and accurate. Id. at 172; Churchill Village, L.L.C. v. Gen. Elec., 361 F.3d 566, 575 (9th Cir. 2004) (notice is satisfactory if it "generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard").

The Court previously found that "the proposed Class Notice complies with Rule 23's requirements and should therefore be certified for purposes of the Proposed Settlement." (Approval Order at 13.) The Court now evaluates whether the parties executed class notice in accordance with the Court's Preliminary Approval Order.

According to Class Counsel, the Notice was disseminated in conformity with the Court's Preliminary Approval Order.  (<u>See</u> Approval Mot. at 9-11 (citations omitted).)  Given Class Counsel's representation that the Notice was disseminated in accordance with the Court's previous order and the number of Class Members who have responded to the Notice, the Court finds that the Notice was reasonable as to its content and the method of communication.

As the terms of the Settlement Agreement were fair, reasonable, and adequate, and because the procedures for dissemination of the Class Notice were the reasonable, the Court finds that the Settlement Agreement should be approved.

**B.   Approval of the Attorneys' Fees Awards, Costs, Incentive Awards and Settlement Administrative Expenses**

The Approval Order approved allocation of settlement funds for attorneys' fees, costs, incentive award payments, and settlement administrative expenses.  As noted above, Class Counsel filed a separate motion (the Fee Mot.) requesting final approval of these expenditures.  The Court addresses each in turn.  <u>Staton v. Boeing Co.</u>, 327 F.3d 938, 963 (9th Cir. 2003) ("[T]o avoid abdicating its responsibility to review the

1  agreement for the protection of the class, a district

2  court must carefully assess the reasonableness of a fee

3  amount spelled out in a class action settlement

4  agreement.").

5

6      **1.  Attorneys' Fees**

7      The Settlement Agreement sets aside $1.125 million,

8  or 25% of the settlement proceeds as attorneys' fees.

9  (Fee Mot. at 1;  Settlement Agreement at 21, § B.)  To

10 calculate the reasonableness of an award of attorney's

11 fees, the Court may use either the percentage-of-the-fund

12 method[5] or the lodestar/multiplier method.[6]  <u>In re</u>

13 <u>Washington Pub. Power Supply Sys. Sec. Litig.</u>, 19 F.3d

14 1291, 1295 (9th Cir. 1994) ("[T]he district court has

15 discretion to use either method in common fund cases.").

16 Regardless of the method used, "the district court should

17 be guided by the fundamental principle that fee awards

18 out of common funds be "*reasonable under the*

19 *circumstances.*"  <u>In re Washington Pub. Power Supply Sys.</u>

20

21 _____

22     [5]  Under the percentage-of-the-fund method, the
   court calculates the fee award by designating a

23 percentage of the total common fund.  <u>Six Mexican Workers</u>
   <u>v. Ariz. Citrus Growers</u>, 904 F.2d 1301, 1311 (9th Cir.

24 1990).

25     [6]  Under the lodestar method, the court calculates
   the fee award by multiplying the number of hours

26 reasonably spent by a reasonable hourly rate and then
   enhancing that figure, if necessary to account for the

27 risks associated with representation.  <u>Paul, Johnson,</u>
   <u>Alston & Hunt v. Graulty</u>, 886 F.2d 268, 272 (9th Cir.

28 1989).

Sec. Litig., 19 F.3d at 1296 (quoting State of Florida v. Dunne, 915 F.2d 542, 545 (9th Cir. 1990)).

Twenty-five percent, the amount requested by Plaintiffs' counsel here, is the "'benchmark' award that should be given in common fund cases." Six Mexican Workers, 904 F.2d at 1311. "The benchmark percentage should be adjusted, or replaced by a lodestar calculation, when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors." Id.

The Court elects to use the percentage-of-the-fund method to determine if the proposed attorney's fees are reasonable. As Class Counsel agree that 25% is reasonable here, and there is no evidence that an award of 25% would be a windfall to Plaintiffs' counsel (see Fischel v. Equitable Life Assur. Soc'y of U.S., 307 F.3d 997, 1007 (9th Cir. 2002)), the Court agrees that the Settlement Agreement's attorneys' fees request is reasonable.

Moreover, assuming the Court used the lodestar method, a review of the billing records submitted by Class Counsel (see Fee Mot. at 11; Declaration of Christopher J. Hamner in Support of Fee Mot. (Doc. No.

63-2) at Ex. 3 (Doc. No. 63-5); Declaration of Chad B.
Wootton in Support of Fee Mot. (Doc. No. 63-7) at Ex. 5
(Doc. No. 63-8); Declaration of Christopher A. Olsen in
Support of Fee Mot. (Doc. No. 63-9) and its attachment
(Doc. No. 63-10)), shows that the fees as calculated by
the lodestar approach would also be reasonable.

### 2.  Costs

The Approval Order approved up to $150,000.00 in
actual litigation costs. (Approval Order at 2, 4.)  Rule
23(h) provides that the Court may award reasonable costs.
Fed. R. Civ. P. 23(h).  Class Counsel has provided an
accounting for its costs, which total $78,134.65.  (Fee
Mot. at 1; Declaration of Christopher J. Hamner in
Support of Fee Mot. at Ex. 4)  The Court finds these
costs to be reasonable.

### 3.  Incentive Awards

"[N]amed plaintiffs, as opposed to designated class
members who are not named plaintiffs, are eligible for
reasonable incentive payments." <u>Staton</u>, 327 F.3d at 977.
Factors the court should consider when assessing whether
individual incentive payments are reasonable include: (1)
the actions the plaintiff has taken to protect the
interests of the class; (2) the degree to which the class
has benefitted from those actions; (3) the amount of time
and effort the plaintiff expended in pursuing the

litigation; and (4) and reasonable fears of workplace
retaliation.  Id.  Courts may also consider: the risk to
the class representative in commencing suit, both
financial and otherwise; the notoriety and personal
difficulties encountered by the class representative; the
amount of time and effort spent by the class
representative; the duration of the litigation; and the
personal benefit (or lack thereof) enjoyed by the class
representative as a result of the litigation.  Van
Vranken v. Atl. Richfield Co., 901 F. Supp. 294, 299
(N.D. Cal. 1995).  "Courts have generally found that
$5,000 incentive payments are reasonable."  Alberto v.
GMRI, Inc., 252 F.R.D. 652, 669 (E.D. Cal. 2008).


     The Court approved preliminarily an incentive award
of $5,000 for Ahdoot and Clark as named Plaintiffs.
(Approval Order at 7-8.)  The Court stated "that the
named Plaintiffs should be recognized and compensated for
their assistance and involvement throughout the
litigation, and that a $5,000 incentive award for each
named Plaintiff is appropriate."  (Id. at 16.)  Along
with the Fee Mot., Ahdoot and Clark submitted
declarations explaining the work they have done in this
case from its inception to the parties' assent to the
Settlement Agreement.  (See Declaration of Payam Ahdoot
in Support of Fee Mot. (Doc. No. 63-12); Declaration of
Brandon Clark in Support of Fee Mot. (Doc. No. 63-13).)

28

The Court agrees that a $5,000 incentive payment to each named Plaintiff is reasonable.

### 4.   Settlement Administration Costs

The Court previously approved of the appointment of Rust Consulting, Inc., to serve as the Settlement Administrator.  (Approval Order at 17.)  Expenses in the range of $113,219 to $218,757 were approved, as 50,000 to 150,000 claimants were expected.  (Id.)  According to Class Counsel, the amount invoiced to date is $104,941.78 and it is estimated that an additional $89,583.00 will be invoiced to complete the administration of the Settlement, for a total of $194,524.78.[7]  (Fee Mot. at 24.)  As these costs are within the approved range, and an explanation of the costs is supported by a declaration from a Rust Consulting Employee (see Declaration of Tore Hodne in Support of Fee Mot. (Doc. No. 63-11)), the Court approves of the stated Settlement Administrator costs.

As all the fees and costs as noted in the Fee Mot. are fair, reasonable, and supported by the supplied evidence, the Court GRANTS the Fee Mot.

---

[7]   Class Counsel filed a Notice of Errata explaining that the initial amount requested in the motions for settlement administration costs was in error, and that the correct amount was $194,524.78.  (See Doc. No. 65.)

1

### IV. CONCLUSION

2      For the reasons stated above, the COURT APPROVES the

3 settlement terms and GRANTS the Motion for Final Approval

4 of Class Action Settlement.  Moreover, the Court GRANTS

5 the Motion for Attorney Fees, Costs, Incentive Awards,

6 and Settlement Administration Costs.

7

8      **IT IS SO ORDERED.**

9

10

Dated: April 6, 2015_____      _____

11                                    VIRGINIA A. PHILLIPS
                                 United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28